GEORGE ROSADO ET AL. *v.* BRIDGEPORT ROMAN
CATHOLIC DIOCESAN CORPORATION ET AL.
(AC 23014)

J. KNECHT *v.* BRIDGEPORT ROMAN CATHOLIC
DIOCESAN CORPORATION ET AL.
(AC 23015)

IN RE APPLICATION OF NEW YORK TIMES COM-
PANY FOR ORDER VACATING PROTECTIVE
ORDERS AND REQUIRING FILING
OF DISCOVERY MATERIALS
(AC 23016)
(AC 23017)
(AC 23069)
(AC 23078)
(AC 23079)
(AC 23161)

Foti, Flynn and West, Js.

Argued January 10—officially released July 1, 2003

*John B. Farley,* with whom were *Ralph W. Johnson III* and, on the brief, *James F. Stapleton, Joseph T. Sweeney* and *James V. Somers,* for the appellants (named defendant et al.).

*Robert G. Golger,* for the appellants (defendant Charles Carr et al.).

*John F. Conway,* with whom, on the brief, was *W. Glen Pierson,* for the appellants (intervenor John Doe et al.).

*Stephen F. Donahue* filed a brief for the appellant (defendant Martin Frederici).

*Ralph G. Elliot,* with whom, on the brief, was *Stephanie S. Abrutyn,* for the appellee (Hartford Courant Company).

*Jonathan M. Albano,* pro hac vice, with whom were *James S. Rollins* and, on the brief, *George Freeman* and *Eric N. Lieberman,* for the appellees (New York Times Company et al.).

*Opinion*

FLYNN, J. The principal issues in this consolidated appeal are whether the trial court properly (1) granted

the application of the New York Times Company (Times), publisher of the New York Times, requesting that the court create a new file to address its pending motion seeking to vacate sealing and protective orders entered in twenty-three lawsuits alleging sexual abuse of minors by clergymen more than one year after the lawsuits were withdrawn,[1] and (2) vacated the sealing

[1] The twenty-three lawsuits, all of which were withdrawn with prejudice on March 12, 2001, include *George Rosado, Jennilee Rosado, J.L. Powers, Katherine Landro, William Slossar, Ronald Slossar, Alvin Koscelek, James See, Brian Freibott, Sharon See, Sandra Forsberg, Paul Doyle and Ken Koscelek* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka, Bishop Walter Curtis and John Does #'s 1 through 7*, CV-93-0157085-S; *Sharon See and Brian Freibott* v. *Bridgeport Roman Catholic Diocesan Corp. and Raymond Pcolka*, CV-93-0157363-S; *James Krug* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-93-0157366-S; *Jamie Belleville* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-93-0157371-S; *Paul Doyle* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-94-0159065-S; *Sandra Forsberg* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-94-0159066-S; *Alvin Koscelek* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-94-0159067-S; *Katherine Landro* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Bishop Walter Curtis*, CV-94-0159068-S; *J.L. Powers* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Walter Curtis*, CV-94-0159069-S; *Jennilee Rosado* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Walter Curtis*, CV-94-0159070-S; *James See* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Walter Curtis*, CV-94-0159071-S; *Ronald Slossar* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Walter Curtis*, CV-94-0159072-S; *William Slossar* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka and Walter Curtis*, CV-94-0159073-S; *Theresa Pace* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka, Walter Curtis, Edward Egan and Andrew T. Cusack*, CV-95-0157086-S; *Richard Rosado* v. *Bridgeport Roman Catholic Diocesan Corp., Raymond Pcolka, Walter Curtis, Edward Egan and Andrew T. Cusack*, CV-95-0157364-S; *John Doe* v. *Bridgeport Roman Catholic Diocesan Corp., Bishop Edward Egan, Monsignor Lawrence Bronkiewicz and Father Martin Frederici*, CV-99-0157369-S; *J. Fleetwood* v. *Bridgeport Roman Catholic Diocesan Corp., Charles Carr, Bishop Walter Curtis and Bishop Edward Egan*, CV-95-0156274-S; *S.P. Carr* v. *Bridgeport Roman Catholic Diocesan Corp., Walter Curtis and Charles Carr*, CV-95-0159118-S; *M. McDonough* v. *Bridgeport Roman Catholic Diocesan Corp., Bishop Walter Curtis and Bishop Edward Egan*, CV-97-0157365-S; *J. Harding* v. *Bridgeport Roman Catholic Diocesan Corp., Walter Cole-*

and protective orders entered in the twenty-three withdrawn lawsuits. Because we conclude that the court improperly granted the Times' application to create a new file,[2] we reverse that decision and the court's subsequent orders regarding disclosure of the sealed and protected materials.

On March 12, 2001, the plaintiffs in the twenty-three lawsuits against the defendant Bridgeport Roman Catholic Diocesan Corporation (Diocese) and the defendant clergymen affiliated with the Diocese settled and withdrew their lawsuits before going to trial.[3] During pretrial discovery proceedings, sealing and protective orders had been entered with respect to documents and information obtained by counsel.

On March 26, 2002, the Times filed an "emergency motion"[4] with the clerk's office at the Waterbury Superior Court for permission to intervene in three of the withdrawn actions, *Rosado* v. *Bridgeport Roman Cath-*

---

*man, Bishop Walter Curtis and Bishop Edward Egan,* CV-95-0157368-S; *William Kramer and Paul Thornfeldt* v. *Bridgeport Roman Catholic Diocesan Corp., Walter Curtis and Edward Egan,* CV-95-0157311-S; *M. Didato* v. *Bridgeport Roman Catholic Diocesan Corp., Walter Curtis and Edward Egan,* CV-95-0157370-S; *J. Knecht* v. *Bridgeport Roman Catholic Diocesan Corp., Walter Curtis, Edward Egan and Walter Coleman,* CV-96-0157367-S.

[2] One of many procedural improprieties was the trial court's failure to protect the defendants' right to object to the application. See part II B 2 of this opinion.

[3] Each of the withdrawal forms stated that the case was withdrawn as to all defendants without costs to any party.

[4] The motion was described as an "emergency motion" because the files in the settled cases were subject to destruction on March 12, 2002, pursuant to Practice Book § 7-10. Section 7-10 provides in relevant part that civil files, which have been terminated by the filing of a withdrawal when the issues have not been resolved on the merits, may be destroyed upon the expiration of one year from the date of the withdrawal. Although the files in the twenty-three cases had been packed and were ready for destruction, they had not yet been destroyed on the date the emergency motion was filed, and currently are in the custody and control of the clerk's office at the Waterbury Superior Court.

*olic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No. CV-93-0157085-S; *See* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No.CV-93-0157363-S; and *Fleetwood* v. *Bridgeport Roman Catholic Diocesan Corp.*, Superior Court, judicial district of Waterbury, Docket No.CV-95-0156274-S. The motion requested permission to intervene "pursuant to the Connecticut Rules of Court, the common law, and the First Amendment to the United States Constitution, as well as upon such other grounds as the Court may deem appropriate . . . ." The motion also requested that the court issue orders (1) vacating orders previously entered in the three withdrawn actions sealing judicial documents and restricting public access to pretrial discovery materials and (2) requiring the filing of discovery materials with the court so that all members of the public would have an equal opportunity to review the complete record of the proceedings.[5] A footnote stated that although the motion was directed to the three captioned cases, the Times also was seeking permission to file a consolidated omnibus motion requesting identical relief in twenty other sex abuse cases to which the Diocese had been a party.

The motion indicated that one of the sealing and protective orders it sought to have vacated had been entered on December 8, 1994, in the *Rosado* case, and

[5] The motion specifically requested "(a) . . . an order vacating orders previously entered in these cases sealing judicial documents, including evidentiary materials submitted in connection with summary judgment motions and other matters ruled upon by the Court; (b) . . . an order vacating protective orders that restrict public access to pretrial discovery materials; and (c) to ensure that all members of the public have an equal opportunity to review the complete record of these proceedings . . . an order requiring the filing of all depositions, answers to interrogatories and responses to requests for admission and document requests." Connecticut Practice Book rules do not require the filing of all discovery materials with the court. They are exchanged directly among the parties or their counsel.

that another had been entered on October 23, 1997, in the *Fleetwood* case. The terms of the *Rosado* order, issued by Judge Levin, provided that the order would remain in effect "[u]ntil further order of the court, which order shall be made not later than the completion of jury selection . . . ."[6] *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, Superior Court, Docket No. CV-93-0157085-S. Three years later, the *Fleetwood* order provided that "[t]he terms of the protective order issued by Judge Levin in the [*Rosado* case] shall apply."[7] *Fleet-*

---

[6] The full text of the order states: "1. Until further order of the court, which order shall be made not later than the completion of jury selection, all information, documents and transcripts which the parties may obtain through the depositions of the defendants, including persons designated pursuant to Practice Book § 244 (g) 6 [now § 13-27 (h)], and Bishop Edward Egan shall not be disseminated, shown, disclosed, divulged or transmitted by any one to any person or organization other than the parties to this lawsuit and their respective attorneys and to any investigators and potential expert witnesses retained by the parties to this lawsuit or their attorneys and stenographic personnel with a need and obligation to see and receive the same, PROVIDED, that no such information or document shall be disseminated, shown, disclosed, divulged or transmitted to any person whatsoever, other than to the parties and their attorneys, unless and until such other person first is shown a copy of this protective order, reads it, agrees to be bound by its terms and to the terms of any order supplementing this order, and signifies his or her agreement by signing both pages of this order.

"2. All such documents and transcripts which the attorneys representing any of the parties believe in good faith may be entitled to protection from disclosure after the completion of jury selection, shall be marked 'CONFIDENTIAL: SUBJECT TO COURT ORDER' and shall be submitted to the court for review and appropriate order before being released from the protection afforded by this order.

"3. Whenever any pleading, document or motion referencing, incorporating or attaching any documents described in paragraph one of this order is filed with the court or delivered to any judge thereof, it shall be filed or delivered under seal pending review by the court or judge and shall be marked by the party filing or delivering same 'CONFIDENTIAL: SUBJECT TO COURT ORDER'." *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, Superior Court, Docket No. CV-93-0157085S.

[7] The Times has not indicated whether any other sealing and protective orders were entered in the *Rosado* and *Fleetwood* cases. A footnote in the motion memorandum states that "[t]he Times is informed and believes that a similar, if not identical, protective order was entered" in the *See* case, but no such order was identified. The Times also does not indicate which of

*wood* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, Superior Court, Docket No. CV-95-0156274-S.

On April 10, 2002, approximately two weeks after the emergency motion was filed, the court granted the Times' request for immediate adjudication of the matter. A hearing was scheduled for April 16, 2002, but the hearing was continued to April 24, 2002, at the request of the Diocese.[8]

On April 18, 2002, six days before the hearing, the Times wrote a letter to the deputy chief clerk of the Waterbury Superior Court, stating that the Times was submitting an application to open a new file at the request of the judge's clerk. The application explained that the purpose of opening the new file was to "facilitate the Court's administrative function" by serving as a repository for the maintenance of present and future filings relating to the emergency motion or to "similar matters" in the twenty-three withdrawn cases. The application repeated the motion's request for an order vacating the sealing and protective orders and requiring the filing of discovery materials in the three captioned cases.

On April 22, 2002, the Hartford Courant Company (Courant), publisher of the Hartford Courant, filed its own motion to intervene in the three captioned cases "for the reasons stated in [the] Emergency Motion [filed by the Times] and for the sole purpose of arguing in favor of the granting of [the] Emergency Motion." On April 23, 2002, the Diocese filed objections to the Times' motion and application. In its objection to the motion, the Diocese stated that it also was objecting on behalf of the individual defendants in the three captioned cases

---

many other alleged written orders and oral rulings in the twenty remaining cases it seeks to have vacated.

[8] The captions for the orders regarding the hearings identified the three captioned cases by their former file numbers.

and in the "related group of 20 lawsuits" for whom two specified law firms representing the Diocese were counsel of record. The Diocese asserted that the court lacked jurisdiction to order the requested relief because the cases had been withdrawn more than four months earlier.[9]

In its objection to the application, the Diocese argued that, although the Times had filed a motion to intervene, (1) the court no longer had jurisdiction over the withdrawn cases and could not undertake any further proceedings in those actions, (2) the Times had not been and should not be granted intervenor status in the withdrawn cases and thus was not entitled to any substantive or procedural relief, and (3) granting the application could arguably impair the right of the Diocese to object to the motion on grounds relating to jurisdiction and intervention.

Despite the fact that the Times had filed a motion to intervene in three of the withdrawn actions, the court did not grant the motion to intervene in any of those files. Instead, the court announced at the outset of the April 24, 2002 hearing that because the twenty-three cases had been withdrawn more than one year earlier, it would docket the motion and the application in a new file, to be designated as X06-CV-02-0170932-S. The court explained: "In entering this new file, I'm not deciding the jurisdictional claims of the Diocesan Corporation or the other defendants . . . . I understand that the Diocese and the other defendants have not waived

---

[9] The Diocese also listed several other grounds for denying the motion in its entirety or in significant part, including violation of the Diocese's state and federal constitutional rights; failure of the Times to establish the extraordinary circumstances necessary to vacate the protective orders, to show good cause for maintaining the protective orders and to give adequate notice; limitations on public access to judicial documents; the effect of well established privileges that prohibit disclosure; and unfair prejudice created by the expedited scheduling order.

or consented to jurisdiction, and their papers in opposition reflect that and I don't mean to decide that by opening the new file . . . ."

When invited by the court to speak on the jurisdictional question, counsel for the Diocese stated that he would "first like to address a procedural issue, if I may . . . of the new docket number." Explaining its objections to opening a new file, including insufficient notice to the parties involved, the Diocese argued that any orders that the court might enter would affect the parties' rights and constitute "an end run around the jurisdictional issue on the part of the . . . Times." The court responded that arguments on the issues of notice and jurisdiction would be heard at a later time. The court stated: "I think these applications need to be addressed in open court, and the means of doing that, the most expeditious way, is to open a new file . . . . It's not a resolution of the jurisdictional issue, I assure you that, and that's what we're going to address now. I've determined it's necessary to do that and to entertain this application, so we'll proceed under this new file over the defendants' objections."

A discussion of jurisdiction followed. The Diocese argued that the court did not have jurisdiction to consider the emergency motion because no motion to open or to restore the cases to the docket had been made within four months of the date of withdrawal pursuant to General Statutes § 52-212a. Consequently, no additional orders could be entered with respect to the withdrawn files. The Times responded that the court had continuing jurisdiction to consider the motion because the sealing and protective orders were injunctive in nature.

As the arguments drew to a close, the Diocese requested an opportunity to brief the issue of continuing jurisdiction prior to addressing the merits. The court

decided, however, to expedite the proceedings and to continue the hearing, stating: "I believe I do have jurisdiction, certainly with respect to what is in the clerk's office in sealed envelopes. I think I do not have jurisdiction to order the parties to file anything, so I really don't feel that there's jurisdiction to enter that type of order.[10] So, we will move onto the merits." Seeking clarification, the Diocese suggested: "What Your Honor just said is not a ruling, it's going to be subject to further briefing . . . ." The court agreed that the issue would be "subject to further briefing. Yes, you can address the jurisdictional issue, but my determination is that I do have jurisdiction, at least with respect to what's been sealed in the files." The court affirmed that the ruling was "subject to being revisited . . . ."

In discussing the merits of providing public access to sealed and protected materials in the withdrawn cases, the Times emphasized that although the emergency motion was addressed to the three captioned cases, notice had been served on at least two other sets of counsel who had appeared in some of the twenty remaining cases that might be affected, either directly or indirectly, by future rulings on the motion. The court concluded the hearing with a request that the parties brief several issues, including whether the court had continuing jurisdiction over the subject matter, what that subject matter might be and whether there were separate grounds for the court's jurisdiction over files in the possession of the clerk. The briefing order was docketed in the newly opened file.

On May 3, 2002, the Washington Post Company (Post), publisher of the Washington Post, and the Globe Newspaper Company (Globe), publisher of the Boston Globe, filed motions to intervene that were substantially

---

[10] The court's remark referred to the Times' request that previously unfiled discovery materials be filed with the court.

similar in content to the motion of the Courant. That same day, the Diocese filed three separate appeals from the trial court's decisions at the April, 2002 hearing.[11] The defendants-appellants in each of those appeals are the Diocese; the Reverend Monsignor Thomas J. Driscoll, as the executor of the estate of the late Bishop Walter Curtis; the Reverend Monsignor Andrew T. Cusack; Bishop Edward M. Egan; the Reverend Monsignor Laurence R. Bronkiewicz; and any of the other defendants for whom two specified law firms representing the Diocese had an appearance on file. On May 6, 2002, a fourth appeal[12] was filed by the first five of seven nonparty priests (John Doe priests) who had been permitted by the Appellate Court to intervene as of right in the *Rosado* case two years earlier. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 60 Conn. App. 134, 758 A.2d 916 (2000). The John Doe priests had requested permission to intervene for the purpose of filing motions to quash, for a protective order and for otherwise preventing disclosure of private, confidential information from their respective personnel files.[13] Id., 135.

---

[11] *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.* (AC 23014), *Knecht* v. *Bridgeport Roman Catholic Diocesan Corp.* (AC 23015), and *In re Application of New York Times* (AC 23016).

[12] *In re Application of New York Times* (AC 23017).

[13] In *Rosado*, the court initially denied the motion of the seven John Doe priests, who previously had been granted permission to use the fictitious names of the Reverend John Does one through seven, for permission to intervene as of right. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 60 Conn. App. 135 n.3. The John Doe priests then appealed to this court, which reversed the trial court's decision. Id., 153. We concluded that there was "clearly no party charged by law with representing their interests" and remanded the matter with direction to grant the nonparty priests intervention as of right. Id. The court granted the John Doe priests intervenor status, and the intervening priests filed a motion to quash subpoenas, for a protective order and for a stay to prevent disclosure of private and personal information contained in their personnel files. At the time the *Rosado* case was withdrawn, the court had not yet ruled on the motion to quash.

Each of the four appeals was taken from the "trial court's 4/24/02 order restoring cases to [the] docket, after passage of more than four months since withdrawal."[14] The third and fourth appeals also were taken from the court's decision to create a new file.

Thereafter, the Diocese notified the court that it would not submit the requested brief in light of the automatic stay triggered by the filing of the four appeals. Nevertheless, on May 8, 2002, the court issued a memorandum of decision and rendered judgment addressing a broad range of procedural and substantive issues raised at the April, 2002 hearing. On that date, the court also made rulings as to the sealed and protected materials.

In its memorandum of decision, the court initially stated that the Times had not requested adjudication of its motion to intervene on April 10, 2002; therefore, the subject memorandum would not decide that motion, but instead would address the Times' request to vacate sealing orders, vacate protective orders and require the filing of discovery materials. The court further stated that Practice Book § 61-11 did not affect its jurisdiction and obligation to resolve the issues raised in the Times' application.[15] Section 61-11 provides that when an appeal is taken from an order or judgment of the Supe-

[14] The *Rosado* and *Knecht* appeals, AC 23014 and AC 23015, were filed under the docket numbers for the two corresponding withdrawn actions, *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, CV-93-0157085-S, and *Knecht* v. *Bridgeport Roman Catholic Diocesan Corp.*, CV-96-0157367-S, and also listed the other twenty-one cases and attached the lists to the appeal forms. The third and fourth appeals, AC 23016 and AC 23017, were filed under the docket number for the newly created file, *In re Application of New York Times*, CV-02-00170932-S.

[15] In its subsequent articulation on June 12, 2002, the court characterized the appeals from the April, 2002 rulings as "frivolous," which may account for its decision to ignore the Practice Book rule providing for an automatic stay of proceedings and to issue the May 8, 2002 judgment after the appeals were filed.

rior Court, the order appealed from is stayed, pending resolution of the appeal by the appellate court hearing the case. See Practice Book § 61-11.[16] The rule also provides that any party may move the court to terminate the stay, although no party did so here.

The court then declared that it had not rendered judgment on the application[17] at the April, 2002 hearing and that any characterization of its actions as restoring cases to the docket was "completely erroneous." The court explained that it had indicated during the hearing that it did not have jurisdiction over the parties, it was not entering rulings in the twenty-three withdrawn cases and none of the files in the twenty-three cases had been opened, despite the fact that the clerk had entered appearances, sua sponte, in the new case file, created at the court's direction, for all of the firms that had represented the parties in the twenty-three withdrawn cases.[18] Despite its declaration that it had not restored the underlying cases to the docket, the court's creation of a new file and its entering of appearances for attorneys who had appeared in the twenty-three withdrawn cases had precisely that effect.

The court concluded that Practice Book § 17-4 and General Statutes § 52-212a,[19] which deprive the court

---

[16] Practice Book § 61-11 (a) provides in relevant part: "Except where otherwise provided by statute or other law, proceedings to enforce or carry out the judgment or order appealed from shall be automatically stayed until the time to take an appeal has expired. If an appeal is filed, such proceedings shall be stayed until the final determination of the cause."

[17] In light of the court's prior statement that it had opened a new file at the April, 2002 hearing, we interpret its subsequent comments regarding the "application" to refer to the Times' contemporaneous request to vacate the sealing and protective orders in *Rosado, Fleetwood* and *See.*

[18] The corrected record indicates that the appearances were not entered properly and that two of the John Doe priests were not notified properly of the new proceeding. See part II B 2 of this opinion.

[19] General Statutes § 52-212a provides in relevant part: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed

of jurisdiction after the passage of four months from the filing of a judgment or withdrawal, were intended to address the court's personal jurisdiction over the parties. The court added that several authorities, including General Statutes § 51-52 (b), a 1943 opinion issued by the attorney general;[20] Opinions, Conn. Atty. Gen. No. 43-141 (June 24, 1943); and Practice Book § 7-7, "all state the obvious, that the court has custody and control of its own files." Indeed, the court declared it essential to the exercise of its inherent powers that it retain jurisdiction over the files in its custody.

The court described the Diocese's "purported 'appeal' of a decision never entered by this court" as part of its continuing effort to frustrate the court's adjudication of a matter of public interest. Although acknowledging that withdrawal of the cases had precluded resolution of the plaintiffs' claims, the court asserted that "the judicial system should not be a party to a cover-up by denying access" to information concerning a matter of such widespread public interest. The court warned against any "facilitation of the cover-up by the courts" and noted that the "public's right to review the workings of government, including its judicial system, is widely acknowledged."

The court stated that it was ready to perform its "duty" to adjudicate the Times' application, the very application that the court had invited, and ordered the disclosure of any nonprivileged sealed records in the twenty-three cases on the basis of an extraordinary legitimate public interest. The court noted that the most

within four months following the date on which it was rendered or passed. . . . The parties may waive the provisions of this section or otherwise submit to the jurisdiction of the court . . . ." Practice Book § 17-4 sets forth a similar rule.

[20] The court incorrectly cited to a 1993 opinion; Opinions, Conn. Atty. Gen. No. 93-023 (August 19, 1993); which addressed health care issues, as authority for its custody and control of court files.

comprehensive sealing and protective order in the files was the *Rosado* order, but rejected the notion that the order had become permanent when the case was withdrawn. Rather, the court found that the *Rosado* order had been temporary and had ended by its own terms with the avoidance of trial by settlement, and that even if the order had not expired, the court retained continuing jurisdiction over the sealed materials pursuant to § 52-212a. The court concluded that no valid order remained denying the public access to materials in the sealed files.

The court finally ordered that any claims of privilege regarding the sealed and protected documents be submitted in a privilege log no later than May 15, 2002, for consideration at a hearing to be held on May 24, 2002, when the claims would be decided. The court envisioned that such claims would be limited to psychiatric records or documents naming the John Doe priests.[21] The court also ordered that documents in the twenty-three cases currently designated as sealed, but not designated as privileged by May 15, 2002, be available for public examination on May 16, 2002. The court denied the Times' request that all other discovery materials be filed with the court.

On May 9, 2002, the defendants filed with this court a motion for review and a motion for supervision of trial court proceedings pending appeal. On May 10, 2002, we ordered counsel to file simultaneous briefs, to appear at an en banc hearing and to give reasons why the appeals from the April 24, 2002 hearing should not be dismissed for lack of a final judgment. We also ordered,

---

[21] Although the court appeared to consider the interests of the John Doe priests, the record indicates that the priests were not notified properly of the new proceeding for the purpose of appearing and asserting their own interests, and that two of the priests never appeared in the new proceeding, either pro se or through counsel. See part II C 2 and footnote 13 of this opinion.

sua sponte, that all trial court proceedings, including the orders of May 8, 2002, regarding the release of sealed documents, be stayed pending further order of this court. In a supplementary order dated May 13, 2002, we ordered counsel to address in their briefs whether the issue of the trial court's jurisdiction was properly before this court on appeal from the April 24, 2002 hearing, or whether it should be raised on appeal from the May 8, 2002 judgment.

During the en banc hearing, discussion turned to the newspapers' status. Noting that the trial court appeared to have granted the substantive relief requested without having acted on the motions to intervene, panel members questioned the newspapers' standing to participate in the appeal. Counsel for the Times ultimately conceded that the court had not acted on the motions to intervene, that the newspapers had no greater standing in the cases than any other member of the public and that counsel for the newspapers were present at the hearing only because they had received notice of the appeal and the court's order requesting briefing.[22] At the

---

[22] The following colloquy took place:

"The Court: What is your standing . . . as of today?

"[Counsel for the Times]: [W]e would say that our standing is the same as it was at the time we showed up before the Superior Court as a representative of the public, no greater right than any member of the public.

&ast; &ast; &ast;

"The Court: [T]he court didn't grant your application to intervene?

"[Counsel for the Times]: That's correct, Your Honor.

&ast; &ast; &ast;

"The Court: [A]ren't there rules we follow, you're either in a case of you're out of a case? If you move to intervene, shouldn't that have been ruled on first?

"[Counsel for the Times]: Yes, Your Honor.

&ast; &ast; &ast;

"The Court: [W]hat standing do you have to be before us today? The motion [to intervene] has not been acted upon by the lower court . . . . You have no appearance, I gather?

"[Counsel for the Times]: I'm here today . . . only really in plain and simple terms, because we received notice of the appeal and of the court's order requesting briefing.

conclusion of the hearing, we marked the jurisdictional question "off," directed the trial court to act on the pending motions to intervene and lifted the stay for that limited purpose. We also ordered the trial court to "articulate the basis for its authority to open a new file at the request of a nonparty, who was not granted intervenor status, over the objections of the parties, more than 120 days after the withdrawal of the actions." Finally, we ordered that the parties and proposed intervenors address that issue in their briefs on the merits, as well as the issue of the trial court's authority to grant party status to the Times and the Courant.

On May 21, 2002, the Reverend Charles Carr and the Reverend Walter Coleman filed an appeal[23] from the trial court's May 8, 2002 orders restoring cases to the docket, after the passage of more than four months from the date of withdrawal, and creating a new file. On May 28, 2002, three more appeals[24] were filed from the May 8 judgment.[25] The second appeal was filed by the Diocese; the Reverend Driscoll, as the executor of the estate of the late Bishop Curtis; the Reverends Cusack and Bronkiewicz; Bishop Egan; and any other defendants for whom the two specified law firms repre-

---

\* \* \*

"The Court: Is it your claim that the only reason you're here, the only way you were here is because the court sent you notice of this hearing . . . ?

"[Counsel for the Times]: As a practical matter, that is true . . . . The notice came in and we prepared our briefs . . . ."

[23] *In re Application of New York Times* (AC 23069).

[24] *In re Application of New York Times* (AC 23078), *In re Application of New York Times* (AC 23079), and *In re Application of New York Times* (AC 23161).

[25] The appeal forms state that the second and third appeals were taken from the court's May 8, 2002 ruling that it had the authority or jurisdiction to act in the underlying cases after the passage of more than four months from the date of their withdrawal, and from its order to disclose confidential, judicially protected documents. The fourth appeal was taken from the court's May 8, 2002 order restoring cases to the docket after more than four months from the date of their withdrawal, the creation of a new case file and the order to unseal the previously sealed files.

senting the Diocese had an appearance on file. The third appeal was filed by the John Doe priests numbers one through five. The fourth appeal was filed by Father Martin Frederici.

On June 7, the trial court issued a document indicating that "all pending motions to intervene in the above captioned matter," namely, the file designated in the order as *Application of New York Times* v. *Sealed Records*, X06-CV-02-0170932-S, which the court had created, sua sponte, without any summons, mesne process, service of process, bond[26] or recognizance,[27] had been granted. The document also indicated that "any pending motions to intervene that [had] been filed in any of the cases brought against the [Diocese] and others, which cases were withdrawn in March, 2001," had been denied.

On June 12, 2002, the court issued a memorandum articulating the basis for its authority to open a new file. In its memorandum, the court first declared that it had subject matter jurisdiction over the files in its custody, and that the only actions it had taken at the April 24 hearing were to issue a briefing schedule and to assure those in attendance that it had no jurisdiction to order the parties to act in the twenty-three cases. The court explained that each of its decisions to date had been informed by the rules of practice dictating the expeditious resolution of issues created by orders

---

[26] A bond is an obligation in writing under seal, which binds a principal as obligor to pay a sum certain to an obligee upon the happening of an event or condition. If a bond with surety is required, a person, firm or corporation, acting as a surety on the bond, engages in writing to be answerable for the performance of the principal on the bond. See General Statutes § 52-185; Practice Book § 8-3; *DiPietro* v. *Board of Tax Review*, Superior Court, judicial district of Ansonia-Milford, Docket No. 040680 (January 22, 2003).

[27] A recognizance is an oral acknowledgement of obligation before a duly qualified officer to be entered of record. 1 E. Stephenson, Connecticut Civil Procedure (2d Ed. 1970) § 79, p. 333.

sealing files,[28] which efforts had been rendered futile by the June 5, 2002 orders of this court.

The court further explained that the clerk of the court had date stamped the emergency motion in the three captioned cases, but had not been able to docket the motion in those three files because the cases had been withdrawn more than one year earlier and could not be restored to pending status. The court, therefore, had determined, after discussing the matter with the clerk's office and the presiding civil judge of the Waterbury judicial district, that the most efficient tool for resolving the issues raised would be to invite the Times to file a separate application for the relief requested in its motions. Accordingly, following receipt of the Times' application, the court opened a new file on April 18, 2002. The court emphasized that the motion had been placed in the new file to preserve its content, the file merely serving as a vehicle for compiling all of the

[28] The court referred to Practice Book §§ 11-20 (e) and 77-1. Section 11-20 (e) provides: "With the exception of orders concerning the confidentiality of records and other papers, issued pursuant to General Statutes § 46b-11 or any other provision of the general statutes under which the court is authorized to seal or limit the disclosure of files, affidavits, documents or other materials, whether at a pretrial or trial stage, any person affected by a court order that seals or limits the disclosure of any files, documents or other materials on file with the court or filed in connection with a court proceeding, shall have the right to the review of such order by the filing of a petition for review with the appellate court within seventy-two hours from the issuance of such order. Nothing under this subsection shall operate as a stay of such sealing order." Section 77-1 (a) provides in relevant part: "[A]ny person affected by a court order which prohibits the public or any person from attending any session of court, or any order that seals or limits the disclosure of files, affidavits, documents or other material on file with the court or filed in connection with a court proceeding, may seek review of such order . . . . Any party or nonparty who sought such order may file a written response within ninety-six hours after the filing of the petition for review. . . . The appellate court shall hold an expedited hearing on any petition for review . . . . After such hearing the appellate court may affirm, modify or vacate the order reviewed." None of the newspapers sought relief from the court under this section of the rules.

papers related to the application and facilitating presentation of the Times' claims.

The court stated that although it had acted on the motions to intervene filed by the Courant, the Globe and the Post in the newly opened file, it had not done so in the twenty-three withdrawn cases because the motion had not been docketed in those files.[29] The court reiterated that it had not opened the withdrawn files.

With respect to other matters, the court articulated that inactive files are in the custody of the court pursuant to General Statutes § 51-52 (b) and Practice Book § 7-7, and that the court's authority to open a new file is derived from its inherent power and duty to address the complaints, applications and petitions that are presented to it. The court stated that its obligation to address such matters was especially compelling in the present circumstances, where "interpretation and clarification of court orders is required." The court also explained that the Times had status as a nonparty to request the opening of a new file because it represented the public in seeking access to public records in the custody of the court. The Times, therefore, did not require or receive court permission to file a claim for relief as an intervening party. Correspondingly, the applications to intervene in the new file by the other newspapers, which had not joined in the Times' request that a new file be opened, had been granted. Furthermore, those applications had not been docketed in the

_____

[29] None of the newspapers sought permission to intervene in the newly opened file. The Times and the Courant moved to intervene in the *Rosado*, *Fleetwood* and *See* cases, as indicated in the captions of their respective motions. The captions of the motions filed by the Globe and the Post contained the number of the newly created file, but the motions explained that their purpose was to intervene in the action for the same reasons, and, hence, in the same cases, as the Times. The court did not explain the meaning of the document issued on June 7, 2002, stating that "all" pending motions to intervene in the newly created file had been "granted," which presumably included the motion to intervene that had been filed by the Times.

twenty-three withdrawn files because the cases were no longer pending.

The court stated that it had interpreted and clarified the scope, duration and application of the sealing orders in the May 8, 2002 memorandum of decision, citing as authority *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 796 A.2d 1164 (2002), authored by Chief Justice Sullivan for a unanimous Supreme Court on May 21, 2002. Although the trial court had taken no documentary evidence or testimony regarding Superior Court actions delaying trials, encouraging plaintiffs to sign settlement agreements containing confidentiality or nondisclosure provisions and improperly entering protective orders, it nonetheless charged that Connecticut courts had facilitated a cover-up of the scandal within the Catholic church by sealing the files over the objections of the victims, delaying trials, thus encouraging plaintiffs to enter into settlement agreements containing confidentiality and nondisclosure provisions, and preventing timely adjudication of the merits of the Times' application for public access. The court stated that it would have been a dereliction of its duty, and morally and legally indefensible, "to ignore its inherent power over its own files behind the fig leaf of a hypertechnical understanding of its jurisdiction . . . ."

I

Before we address the issues raised by the defendants, we digress momentarily to respond to the trial court's charge that the orders entered by this court, including the stay of trial court proceedings, have contributed to unnecessary delay and facilitated or made this court a party to a cover-up of the scandal within the Catholic church. A charge of judicial impropriety is "a most grave accusation. It strikes at the heart of the judiciary as a neutral and fair arbiter of disputes

for our citizenry." *Wendt* v. *Wendt*, 59 Conn. App. 656, 697, 757 A.2d 1225, cert. denied, 255 Conn. 918, 763 A.2d 1044 (2000). It also places a stain on the court that cannot easily be erased. Id. The charge here is especially regrettable because it is totally unsubstantiated by the record and is made by a judge of our Superior Court who did not take evidence in support of his accusations. See *Murray* v. *Murray*, 65 Conn. App. 90, 99–100, 781 A.2d 511 (assault on integrity of court should be made only when substantiated by trial record), cert. denied, 258 Conn. 931, 783 A.2d 1025 (2001).

General Statutes § 51-14 (a) provides in relevant part that the "judges of the Supreme Court, the judges of the Appellate Court, and the judges of the Superior Court shall adopt and promulgate . . . rules and forms regulating pleading, practice and procedure in judicial proceedings in courts in which they have the constitutional authority to make rules, for the purpose of simplifying proceedings in the courts and of promoting the speedy and efficient determination of litigation upon its merits. . . ." Practice Book § 1-8 provides that the purpose of the rules of procedure is to "facilitate business and advance justice . . . ." At times, those two goals may appear to conflict when parties utilize the rules to the fullest extent possible in seeking adjudication of their claims. There can be no doubt, however, that the proper administration of justice requires our faithful adherence to the procedural requirements embodied in the legislation enacted by our General Assembly and the rules of practice adopted and codified by the judges of our Superior Court. This is so, even where their application may result in delay or inconvenience for those involved in the proceedings. In this adherence we are not unique.

The importance of rules in ensuring fundamental fairness to all parties in a legal dispute has been the subject of repeated comment by state and federal courts. The

prevailing view was expressed in *United States* v. *Martinez-Fuerte*, 428 U.S. 543, 578, 96 S. Ct. 3074, 49 L. Ed. 2d 1116 (1976) (Brennan, J., dissenting), where Justice Brennan observed that "[t]he cornerstone of this society, indeed of any free society, is orderly procedure." "[I]t is procedural due process that is our fundamental guarantee of fairness, our protection against arbitrary, capricious, and unreasonable government action. Mr. Justice Douglas has written that . . . '[i]t is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law.' . . . And Mr. Justice Frankfurter has said that '[t]he history of American freedom is, in no small measure, the history of procedure.'" (Citation omitted.) *Board of Regents* v. *Roth*, 408 U.S. 564, 589–90, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) (Marshall, J., dissenting).

"Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. . . . [T]he procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. Procedure is to law what scientific method is to science." (Internal quotation marks omitted.) *In re Gault*, 387 U.S. 1, 19–21, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967).

In accordance with those principles, we do not believe it necessary, wise or lawful to sacrifice the procedural safeguards built into our system of justice to achieve a more expeditious resolution of the issues in

favor of one side of a dispute. Speed achieved at the expense of individual rights would be a hollow victory indeed. The automatic stay of proceedings that normally takes effect during the pendency of an appeal is a well established and widely used provision of the Connecticut rules of practice. Fairness demands that we adhere to the same due process requirements in high profile cases that we follow in cases of far less complexity and public significance. Consequently, any attempt to characterize our compliance with appellate rules that stay a trial court's action until an appeal is heard as facilitating a "cover-up" is misguided. Unsupported charges that the Superior Court engaged in behavior that facilitated a "cover-up" are equally imprudent. That being said, we now turn to the task before us.

## II

To simplify our analysis, we first address the issues raised in the four appeals from the April, 2002 rulings. We then discuss the issues presented in the four remaining appeals from the May, 2002 judgment.

## A

We begin by considering whether the four appeals from the April rulings should be dismissed for lack of an immediately appealable final judgment. The defendants appeal from the trial court's "order" restoring cases to the docket more than four months after their withdrawal and from the court's decision to create a new file. The defendants argue that under *Solomon* v. *Keiser*, 212 Conn. 741, 747–48, 562 A.2d 524 (1989), actions by the court that have the effect of restoring a case to the docket beyond the jurisdictional limitation are immediately appealable where, as here, the issue raised is the trial court's authority to take such actions. The newspapers respond that the appeals are premature because the court expressly denied that it had restored any cases to the docket, and no other final appealable judgment

was entered during the April hearing. We agree with the defendants.

It is well established that with certain statutory exceptions, appeals shall be taken only from final judgments. See General Statutes §§ 51-197a and 52-263; see also Practice Book § 61-1. The purpose of this rule is "to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level." (Internal quotation marks omitted.) *Harvey* v. *Wilcox*, 67 Conn. App. 1, 5, 786 A.2d 533 (2001).

"Withdrawals are analogous to final judgments. . . . Under [the] law, the effect of a withdrawal, so far as the pendency of the action is concerned, is strictly analogous to that presented after the rendition of a final judgment or the erasure of the case from the docket." (Internal quotation marks omitted.) *Sicaras* v. *Hartford*, 44 Conn. App. 771, 775–76, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). "[T]he motion to restore a case to the docket is the vehicle to 'open' a withdrawal, while the motion to open is the vehicle to open judgments." Id., 776. Because withdrawals are analogous to final judgments, there is a finite time period during which a withdrawn case can be restored to the docket, just as there is a finite time period during which final judgments can be opened. Id., 776–77.

The applicable statutory provision concerning the time to open a judgment or to restore a case to the docket is § 52-212a; see id., 776; which provides in relevant part that "[u]nless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. . . ." General Statutes § 52-212a. Generally speaking,

an order to open a judgment is not immediately appealable. An exception to the rule is where an appeal challenges the authority of the court to open or to set aside the judgment. *Solomon* v. *Keiser*, supra, 212 Conn. 747–48. The claim of the defendants, that the court lacked authority to restore the underlying cases to the docket, is just such a challenge.

We agree with the defendants that in granting the Times' application to create a new file, the court exercised direct authority over the underlying cases, which had the same effect as restoring those cases to the docket. See id., 747 (order releasing escrow funds deemed "comparable" to order opening judgment). Although the court declared that it had not opened the cases or restored them to the docket, and even described such a notion as "completely erroneous," it also referred to its "duty" to adjudicate the applications, stating: "*I think these applications need to be addressed in open court, and the means of doing that, the most expeditious way, is to open a new file* . . . . It's not a resolution of the jurisdictional issue, I assure you that, and that's what we're going to address now. I've determined it's necessary to do that and to entertain this application, so *we'll proceed under this new file* over the defendants' objections." (Emphasis added.) Thereafter, the court considered the emergency motion on its merits, just as it would have done had the Times filed, and the court granted, a motion to restore the underlying cases to the docket.

The Courant argues that the court never entered an order to restore the cases to the docket, did not intend to do so, did not purport to do so and expressly disclaimed having done so at the April hearing and in the June articulation. The Courant further argues that the defendants have not established through evidence or

testimony that postwithdrawal activity occurred in any of the twenty-three files. We take a different view.

Our Supreme Court has acknowledged on more than one occasion that a trial court's subsequent actions in a withdrawn case may be the "functional equivalent" of restoring the case to the docket. *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 391, 685 A.2d 1108 (1996), overruled in part on other grounds, *State* v. *Salmon*, 250 Conn. 147, 154–55, 735 A.2d 333 (1999) (en banc); see also *Solomon* v. *Keiser*, supra, 212 Conn. 747. In *Chowdhury*, the trial court adjudicated a motion for contempt filed against the plaintiff's attorney for failure to comply with a previously imposed sanctions order without first restoring the withdrawn case to the docket. *CFM of Connecticut, Inc.* v. *Chowdhury*, supra, 383–85. On appeal, our Supreme Court determined that the trial court's action was the functional equivalent of granting a motion to restore. Id., 391. The court explained that to conclude otherwise "would be to elevate form over substance" because it was clear from the opinion that the court considered it "necessary" to decide the issues raised. Id. The Supreme Court later added: "To read the record any other way would be to blink at reality." Id., 392.

The court reached a similar conclusion in *Solomon*, where judgment had been rendered in accordance with a stipulated agreement requiring the plaintiff to deposit money in an escrow account for the purchase of real property owned by the defendant. *Solomon* v. *Keiser*, supra, 212 Conn. 743. Six months later, a dispute arose as to the terms of the stipulated agreement. Id. After the parties failed to settle, the trial court returned the case to the docket and granted the plaintiff's motion to release the escrow fund. Id., 742.

In an articulation, the court stated that by returning the escrow funds to the plaintiff, it intended to "recreate

and maintain that status quo [prior to the stipulated judgment] so that the trial de novo . . . would resolve the case once and for all." (Internal quotation marks omitted.) Id., 744. We dismissed the defendant's appeal from the trial court's order for lack of a final judgment. Id., 744–45. Our Supreme Court granted the defendant's petition for certification to appeal on the issue of whether we had erred in dismissing the appeal after the trial court had opened and set aside a stipulated judgment and authorized the release of a previously ordered escrow fund. Id., 745.

Our Supreme Court reversed this court's dismissal of the appeal and remanded the case to this court for further proceedings on the ground that the defendant's claim that the court lacked authority to open the judgment was immediately appealable. Id., 747–48. Although the plaintiff had never filed a motion to open the judgment, the Supreme Court viewed the trial court's actions as having the same effect. Id., 747. The court specifically noted the plaintiff's admission that the trial court's ruling on the escrow fund was "comparable" to opening the judgment.[30] Id.

Here, as well, the trial court's actions had the equivalent effect of restoring the underlying cases to the docket. Despite the court's assertions to the contrary, and notwithstanding the absence of a formal motion to restore, creating the new file allowed the court to conduct a full blown hearing on procedural and substantive issues, request that the parties file briefs and otherwise act as if it had restored the underlying cases to the docket. In one such act, the clerk of the court entered appearances in the new file, sua sponte, for law firms that had represented the parties in the twenty-

---

[30] On remand, this court also treated the issue as one involving the opening of a judgment. *Solomon* v. *Keiser*, 22 Conn. App. 424, 425 n.1, 577 A.2d 1103 (1990).

three withdrawn cases, despite the fact that the firms themselves had not entered appearances on behalf of their former clients. It is of no significance whatsoever that the judicial act in question involved the opening of a new file and not the granting of a motion. The result in *Chowdhury*, *Solomon* and the case at hand was for all intents and purposes the same, that is, to continue the proceedings in a withdrawn case or in a case previously concluded by a final judgment.

The newspapers nonetheless argue that, even if the court restored the underlying cases to the docket,[31] the appeals are improper under *State* v. *Curcio*, 191 Conn. 27, 463 A.2d 566 (1983). *Curcio* provides that "[a]n otherwise interlocutory order is appealable in two circumstances: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them." Id., 31. The Courant specifically argues that the appeals from the April hearing must fail under the first prong of *Curcio* because there was no separate proceeding in which the opening of the file was the culminating act. It also argues that the appeal must fail under the second prong of *Curcio* because the rights of the defendants have not been concluded so that further proceedings cannot affect them.

Our Supreme Court determined in *Solomon*, where the defendant raised a similar argument, that an exception exists to the final judgment rule and that the *Curcio* test need not be applied where the court's authority to open a judgment is challenged. *Solomon* v. *Keiser*, supra, 212 Conn. 746–48. Citing *Smith* v. *Reynolds*, 54 Conn. App. 381, 382 n.1, 735 A.2d 827 (1999), the

---

[31] The Courant describes the court's actions as opening the cases rather than restoring them to the docket. As this court explained in *Sicaras*, however, the latter is the more appropriate way to characterize events in the present circumstances. See *Sicaras* v. *Hartford*, supra, 44 Conn. App. 775–76.

Courant ultimately concedes this exception to the rule, thus defeating its own argument. We, accordingly, conclude that the appeals from the April rulings are taken properly.

B

We now consider the defendants' claim that the court lacked authority to restore the underlying cases to the docket. The defendants argue, first, that the court was precluded from taking the actions that it did by the four month jurisdictional limitation in § 52-212a and, second, that the court had no inherent authority over the files in its custody that would have permitted it to so act.[32] We agree.

The issue of the court's authority to act is a question of law. *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission,* supra, 260 Conn. 239–40. Our review is, therefore, plenary. Id.

1

We first address the defendants' claim that the court lacked authority under § 52-212a to restore the underlying cases to the docket. As previously discussed, the statute limits the court's authority to open or to set aside a judgment unless the requisite motion is filed within four months after judgment is rendered or passed. See General Statutes § 52-212a. Here, however, the Times filed its motion and application more than one year after the underlying cases were withdrawn. We, therefore, conclude that the court lacked authority to restore the cases to the docket, a conclusion that the trial court also reached in its June 12, 2002 articulation.

---

[32] The defendants also claim that the court had no authority to consider or to award the relief requested by the newspapers without granting them intervenor status in the withdrawn cases. We do not consider that argument here because it does not become germane unless we first conclude that the court had authority to restore the underlying cases to the docket.

General Statutes § 52-212a provides for several exceptions to the four month limitation, but none applies in this case. "The parties may waive the provisions of [the statute] or otherwise submit to the jurisdiction of the court"; General Statutes § 52-212a; but the parties here did not waive the statutory provision or submit to the court's jurisdiction. The statutory exception, "[u]nless otherwise provided by law"; General Statutes § 52-212a; also does not apply, because the parties have not briefed, and we are not aware of, any existing law that would have permitted the court to revisit the cases beyond the jurisdictional limitation.

The only remaining statutory exception is where the court retains "continuing jurisdiction." Whether a court has continuing jurisdiction with respect to sealing and protective orders in place at the time a case is concluded or withdrawn appears to be an issue of first impression in Connecticut.

The newspapers argue that the court had continuing jurisdiction in the underlying cases pursuant to *AvalonBay Communities, Inc.*, in which our Supreme Court explained that continuing jurisdiction is grounded in the court's inherent powers to effectuate its prior judgments, either by summarily ordering compliance with a clear judgment or by interpreting an ambiguous judgment and entering orders to effectuate that judgment. *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 260 Conn. 246. We conclude, however, that *AvalonBay Communities, Inc.*, is inapposite.

*AvalonBay Communities, Inc.*, was a case in which the defendant plan and zoning commission of the town of Orange rejected the plaintiff's application seeking approval to build a luxury apartment complex with a percentage of affordable housing units. Id., 234. The plaintiff appealed to the Superior Court. Id. The court

sustained the appeal and ordered approval of the application "pending any reasonable and necessary conditions" imposed by the defendant. (Internal quotation marks omitted.) Id.

Seven months later, the defendant approved the plaintiff's application subject to sixteen conditions. Id., 236. Thereafter, the plaintiff filed a motion for contempt, claiming, inter alia, that several of the conditions were unreasonable, unnecessary or inconsistent with the court's prior order and that others were impossible to perform. Id., 236–37. Following a hearing, the court ruled that the plaintiff had failed to establish its claim of civil contempt, but ordered the defendant to modify or to rescind some of the disputed conditions. Id., 237–38. The defendant appealed to this court, arguing that, absent a finding of contempt, the trial court lacked continuing jurisdiction to order the defendant to alter the conditions of approval after the passage of four months from the time they were imposed. Id., 238.

The appeal was transferred to our Supreme Court, which concluded that "the trial court had continuing jurisdiction to fashion a remedy appropriate to the vindication of a prior . . . judgment . . . pursuant to its inherent powers and that the time limitations imposed by § 52-212a do not apply to the exercise of that jurisdiction. . . . [T]he court's order to the defendant to modify and rescind the conditions of approval was an effectuation, not a modification, of its prior judgment and was, therefore, within its continuing jurisdiction." (Citation omitted; internal quotation marks omitted.) Id., 239.

The present case is readily distinguishable on its facts from *AvalonBay Communities, Inc.* The court's continuing jurisdiction in *AvalonBay Communities, Inc.*, derived from its equitable authority to vindicate its prior judgment by interpreting the ambiguous term "reason-

able and necessary conditions" in the final judgment orders. See id., 246. It then entered orders effectuating the newly interpreted judgment. Id., 251. Here, by contrast, withdrawal of the underlying cases, which had the same effect as a final judgment, did not give rise to a similar ambiguity requiring interpretation by the court. The withdrawal forms in each of the underlying cases simply stated that the case was withdrawn "as to all defendants without costs to any party." That statement is clear on its face and does not appear to have been challenged by the parties or the newspapers.

Whether the sealing and protective orders in the underlying cases are ambiguous or subject to further interpretation is irrelevant under *AvalonBay Communities, Inc.*[33] The orders were entered early in the pretrial proceedings, and none of the withdrawal documents refers to them. Connecticut courts have made clear, repeatedly and emphatically, that protective orders are interlocutory in nature. See, e.g., *Bailey* v. *State*, 65 Conn. App. 592, 595, 783 A.2d 491 (2001) (protective order precluding defendant from further cross-examination of plaintiff deemed interlocutory); see also *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 46, 730 A.2d 51 (1999) (order protecting discovery documents deemed interlocutory). Therefore, absent their incorporation into the withdrawal documents, the sealing and protective orders in question cannot be considered analogous to

---

[33] In this context, it is unnecessary to consider the arguments as to whether the protective orders became permanent or expired on July 12, 2001, the date the withdrawals became final. That question becomes significant only if we conclude that the court properly restored the underlying cases to the docket, and thus had authority to adjudicate the merits of the newspapers' claim. We also do not address the newspapers' argument that the protective orders did not cover all of the materials in the court files, thus implying that the unprotected materials should be made available for public inspection, because that issue was not specifically raised on appeal.

final judgments subject to the court's continuing jurisdiction pursuant to *AvalonBay Communities, Inc.*[34]

The newspapers next argue that the court has continuing jurisdiction to adjudicate the orders because the language of the *Rosado* and *Fleetwood* orders, "pending further order of the court," expressly contemplated subsequent review and modification by the Superior Court. They point out that the purpose of the *Rosado* order was to prevent the jury pool from being tainted, and that the order specifically anticipated modification or lifting not later than the completion of jury selection. The newspapers also contend that by choosing not to seek alteration of the orders' provisions, the parties consented to the continuing jurisdiction of the court and waived the statutory limitation. We disagree.

Even if some of the orders anticipated modification or lifting, the newspapers cite no authority, other than *AvalonBay Communities, Inc.*,[35] to support the notion that the court had continuing jurisdiction, based solely on the orders' language, to further adjudicate the orders beyond the four month limitation by creating a new file. As we have previously stated, however, the holding in *AvalonBay Communities, Inc.*, applies only to final judgments, not to interlocutory orders, and we are not aware of any other Connecticut statutory or common-law authority that supports the newspapers' claim.

Moreover, we cannot infer that the defendants waived the statutory limitation merely because they

[34] Because we decide that *AvalonBay Communities, Inc.*, is not relevant to the present analysis, in that the protective orders were interlocutory and were not incorporated within the withdrawal documents, we do not reach the parties' arguments regarding the trial court's power to effectuate a final judgment.

[35] The Times also cites *Connecticut Pharmaceutical Assn., Inc. v. Milano*, 191 Conn. 555, 563, 468 A.2d 1230 (1983), for the proposition that "the trial court has continuing jurisdiction 'to fashion a remedy appropriate to the vindication of a prior . . . judgment,' " as the court did in *AvalonBay Communities, Inc.*, but that case is inapposite for similar reasons.

did not seek to alter the orders' provisions. "Waiver involves an intentional relinquishment of a known right. . . . There cannot be a finding of waiver unless the party has both knowledge of the existence of the right and intention to relinquish it. . . . Waiver may be inferred from the circumstances if it is reasonable so to do. . . . Whether conduct constitutes a waiver is a question of fact." (Internal quotation marks omitted.) *Cassella* v. *Kleffke*, 38 Conn. App. 340, 347, 660 A.2d 378, cert. denied, 235 Conn. 905, 665 A.2d 899 (1995). The newspapers have not identified any conduct on the part of the defendants that can be construed as a waiver of the four month limitation, nor did the court make any such finding. In fact, the court stated at the April 24 hearing that it understood that "the Diocese and the other defendants have not waived or consented to jurisdiction . . . ." Accordingly, the newspapers' argument is unavailing.

The newspapers further argue that the court had continuing jurisdiction to restore the underlying cases to the docket and to consider the motion because the sealing and protective orders were injunctive in nature. The newspapers argue that it is well established in Connecticut that the court retains the power to change or modify injunctions, which power is not limited by § 52-212a. See *Adams* v. *Vaill*, 158 Conn. 478, 482, 262 A.2d 169 (1969) ("courts have inherent power to change or modify their own injunctions where circumstances or pertinent law have so changed as to make it equitable to do so"). We do not agree that the court had continuing jurisdiction on the ground that the orders were injunctive.

Injunctions and protective orders are substantively different because an injunction is a remedy; see D. Dobbs, Remedies (1973) § 2.10, p. 105; and a protective order is a case management tool. See R. Marcus, "Myth and Reality in Protective Order Litigation," 69 Cornell

L. Rev. 1, 27–29 (1983). The newspapers cite no Connecticut authority for the proposition that the protective and sealing orders in the withdrawn cases were injunctions subject to the continuing jurisdiction of the court. The reliance of the Times and the court on *Conservation Commission* v. *Price*, 5 Conn. App. 70, 496 A.2d 982 (1985), is misplaced. The issue in that case was the trial court's authority to award attorney's fees at the conclusion of an appeal from the court's prior order entering a permanent injunction, an entirely different question from the one we consider here. The Times also incorrectly relies on *Public Citizen* v. *Liggett Group, Inc.*, 858 F.2d 775 (1st Cir. 1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 838, 102 L. Ed. 2d 970 (1989), in which the United States Court of Appeals for the First Circuit observed that protective orders and injunctions have certain characteristics in common.

In *Liggett Group, Inc.*, a diversity action based on the *Liggett* defendants' allegedly inadequate warnings about the health risks of smoking, the District Court entered an order of protection covering discovery materials produced by the defendant. Id., 776. The order also provided that within forty-five days after final adjudication or settlement of all claims, counsel for the parties should destroy all documents produced or return them to the producing party at the party's request. Id. We note that there was no such order for forty-five days or any other time period following settlement or judgment in the present case.

*Liggett Group, Inc.*, was finally adjudicated on November 23, 1987. Id., 786. Thirty-five days later, on December 28, 1987, Public Citizen Litigation Group (Public Citizen), a nonparty representing a group of public health organizations, sought modification of the protective order such that all discovery materials could be freely disseminated, except for those documents in which the *Liggett* defendants had good cause for

continued confidentiality. Id., 778. Public Citizen based its request on rules 5 (d)[36] and 26 (c)[37] of the Federal Rules of Civil Procedure. Id., 778–79. Public Citizen argued that rule 5 (d) creates a presumption that all discovery materials will be available to the public because they will be filed in court, and that under rule 26 (c), public access can be cut off through a protective order only upon the showing of good cause, which no longer existed. Id., 779. Connecticut has no similar rule requiring that discovery materials be filed in court, as rule 5 requires in the federal court. See Practice Book § 13-10. Under Connecticut rules, only "[o]bjections but not responses" to discovery requests "are filed in court." W. Horton & K. Knox, 1 Connecticut Practice Book Series: Practice Book Annotated (4th Ed. 1998) § 13-10, comments, p. 466.

Public Citizen did not make a formal motion to intervene in the case pursuant to rule 24 of the Federal Rules

---

[36] Rule 5 (d) of the Federal Rules of Civil Procedure, as it existed at the time that *Liggett Group, Inc.*, was decided, provided: "All papers after the complaint required to be served upon a party shall be filed with the court either before service or within a reasonable time thereafter, but the court may on motion of a party or on its own initiative order that depositions upon oral examination and interrogatories, requests for documents, requests for admission, and answers and responses thereto not be filed unless on order of the court or for use in the proceeding."

[37] Rule 26 (c) of the Federal Rules of Civil Procedure provides in relevant part: "Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court. . . ."

of Civil Procedure,[38] but sought to proceed informally as a nonparty under rule 16 (g)[39] of the Local Rules of the United States District Court for the District of Massachusetts. *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 779. In the event that the District Court thought intervention necessary, however, Public Citizen requested intervenor status. Id. The *Liggett* defendants opposed Public Citizen's motion, in part because they claimed that the time for requesting intervention had passed. Id. After a hearing, the District Court granted the requested modification on the ground that the outstanding protective order presented a live controversy extending past the dismissal of the underlying claims and that under the federal rules, there is a right of public access to discovery materials. Id., 779–80. The District Court also reasoned that there was no longer a need for continuing the order. Id., 780.

On appeal, the First Circuit concluded that because the order, by its own terms, extended until forty-five days after final adjudication or settlement of the claims, it functioned *during its pendency* "as an injunction, setting forth strict limitations on the parties' use of discovery materials." Id., 782. The First Circuit

---

[38] Rule 24 of the Federal Rules of Civil Procedure provides for "intervention of right" or "permissive intervention" upon "timely application."

[39] "Local Rule 16 (g) is based on Rule 5 (d) of the Federal Rules, but it actually reverses in part the filing presumption of Rule 5 (d), by providing that discovery materials ordinarily are not to be filed in court 'unless so ordered by the court or for use in the proceeding.' Essentially, Rule 16 (g) codifies the local practice of district courts always ordering—as Rule 5 (d) permits—that discovery materials otherwise subject to the Rule 5 (d) filing requirement not be filed pursuant to Rule 5 (d) unless the court asks that they be filed. To facilitate this scheme, Rule 16 (g) provides that parties and nonparties may request that filing be ordered: 'If for any reason a party or concerned citizen believes that any [discovery documents subject to the Rule 5 (d) filing requirement] should be filed, an ex parte request may be made that such document be filed, stating the reasons therefor. The court may also order filing sua sponte.' " *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 779.

explained that "the district court necessarily had the power to enforce the order, at any point while the order was in effect, including periods after judgment. . . . Correlative with this power to enforce, the district court necessarily also retained power to modify the protective order in light of changed circumstances." Id. The court concluded: "Consistent with this well-established rule, we think that the district court in this case has the inherent power to modify its . . . protective order *for so long as the order was in effect* . . . even after judgment, when circumstances justify." (Emphasis added.) Id.

We conclude that *Liggett Group, Inc.*, stands for the limited proposition that a protective order covering discovery materials operates like an injunction, subject to continuing modification by the court, only while a case is active or where the order contains language that specifically extends its directives to the postjudgment period.[40] In *Liggett Group, Inc.*, the terms of the order provided that it would remain in effect during the forty-five days following final adjudication of the complaint, a time when the parties were directed either to destroy all discovery materials or to return them to the producing party. Id., 777. During that period, the order could be modified. The District Court did *not* address the order's status *after* expiration of the forty-five day post-judgment period in situations where, for example, the discovery materials are not destroyed or not returned to the producing party, a situation comparable to the present case.

The *Rosado* order provided that it would remain in effect until "further order of the court," specifically, "not later than the completion of jury selection." That language cannot be construed as extending the court's

---

[40] *Liggett Group, Inc.*, did not comment on whether protective orders expired or remained permanent following the designated period of operation.

jurisdiction or authority to modify the order beyond the four month limitation of § 52-212a on the ground that the order was injunctive. The *Rosado* order did not speak to postjudgment or postwithdrawal activity by the parties or the court, as the order did in *Liggett Group, Inc.* Lacking specific postjudgment directives, the court had no continuing jurisdiction to modify the order's terms more than four months after the date of withdrawal under the principles in *Liggett Group, Inc.* The mischief in concluding to the contrary is that parties in similar cases would be subject to the possibility of endless litigation long after the cases had been adjudicated or withdrawn. To the extent that the newspapers rely on *Liggett Group, Inc.*, we therefore conclude that that case is not persuasive because it is distinguishable on the facts from the present case.

We also note that a theory of unending continuing jurisdiction in cases such as this would not be consistent with Practice Book § 7-10, which permits destruction of the files in a withdrawn action one year after the date of withdrawal; see footnote 4; and with our long-standing policy of promoting judicial economy, the stability of former judgments and finality. See *Cumberland Farms, Inc.* v. *Groton*, 262 Conn. 45, 58, 808 A.2d 1107 (2002). Continuing jurisdiction also could wreak havoc with the important public policy of encouraging pretrial resolution of disputes; *Schroeder* v. *Triangulum Associates*, 259 Conn. 325, 341, 789 A.2d 459 (2002); where a party sometimes will buy his peace, though guilty of no wrongdoing, to end continuing litigation against him.

Furthermore, even were we to conclude that the court had continuing jurisdiction in this case under the reasoning in *Liggett Group, Inc.*, the Times' claim would fail because of the determination in that case that a nonparty may proceed only after it has filed, and the

court has granted, a motion to intervene in the underlying action.

Following its discussion of continuing jurisdiction, the First Circuit in *Liggett Group, Inc.*, undertook a lengthy analysis of the defendants' argument that Public Citizen, the nonparty movant, lacked standing because it had not been granted intervenor status and that, in any event, Public Citizen's motion to intervene was untimely. *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 783–85. The First Circuit initially stated that, under the mandatory language of federal rule 24 (c), "*the* procedurally correct course for third-party challenges to protective orders [is intervention, and that the court was unwilling] to create a special category of non-Rule 24 intervention for third parties who wish to challenge protective orders through informal motion." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 783–84. The court justified an exception for Public Citizen, however, because Public Citizen had requested, in the alternative, that it be granted intervenor status, and the District Court had afforded relief to Public Citizen as if it were a proper party, thus implicitly granting it intervenor status. Id., 784. The First Circuit added that, had the District Court thought intervention necessary, it would have treated Public Citizen's motion as a request for intervention, which it would have granted. Id. The First Circuit warned, however, that "[f]uture litigants should not attempt to use this opinion to circumvent the clear requirements of the rule." (Internal quotation marks omitted.) Id.

Here, by contrast, although the Times initially filed a motion to intervene, the court denied the motion outright, insofar as it was directed to the underlying cases, and explained in its articulation that it had not acted on the motion, insofar as it was directed to the new file, because the Times had status as a nonparty

representing the public to request that a new file be opened.[41] According to the court, the Times, therefore, did not require the court's permission to file a claim for relief as an intervening party. Because the court firmly rejected the idea that the Times should be regarded as an intervening party, unlike the District Court in *Liggett Group, Inc.*, we do not view the opening of the new file as the functional equivalent of authorizing intervention by the Times.[42]

The newspapers next argue that the defendants rest their claim on the flawed premise that § 52-212a limits the court's subject matter jurisdiction to consider the motion more than four months after the underlying cases were withdrawn. "Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 485, 815 A.2d 1188 (2003). They argue that the defendants' interpretation of the statute is incorrect because our Supreme Court held in *Kim* v. *Magnotta*, 249 Conn. 94, 104, 733 A.2d 809 (1999), that § 52-212a operates as a constraint, not on the trial court's subject matter jurisdiction, but on its substantive authority to adjudicate the merits of the case before it.

---

[41] Although a court issued document indicated that "all" pending motions to intervene had been granted, we rely on the court's articulation as the more accurate description of its actions.

[42] We distinguish our unwillingness here to view the trial court's action as the functional equivalent of granting a motion for intervention from our *willingness* to characterize the opening of a new file as the functional equivalent of restoring the underlying cases to the docket. The authority we relied on to conclude that the withdrawn cases had been restored to the docket demonstrated clear acceptance of equivalent action in the context of opening a case or restoring a case to the docket. The *Liggett Group, Inc.*, opinion, on the other hand, strongly warns against accepting equivalent action in future cases where parties may attempt to modify sealing and protective orders that are currently in place.

The newspapers misstate the ground asserted by the defendants as the basis for their appeal. The defendants do not claim that the statute limits the subject matter jurisdiction of the court to consider their motion, but that it limits the court's *authority* to adjudicate the motion. Accordingly, the defendants' position is entirely consistent with *Kim*.

The newspapers finally argue that because of the constitutionally based interests inherent in the public's right of access to judicial documents, interpretation of § 52-212a as an absolute bar to requests for modification of sealing or protective orders in cases withdrawn more than four months earlier renders the statute unconstitutional under the first amendment to the United States constitution and article first, § 10, of the constitution of Connecticut. We disagree.

We first point out that the United States Supreme Court concluded in *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32–33, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984), that there is no first amendment right of access to materials derived solely from pretrial discovery. The court stated that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law . . . and, in general, they are conducted in private as a matter of modern practice." (Citation omitted.) Id., 33. Even if we assume, however, that the public has a first amendment right of access to judicial documents in files covered by sealing and protective orders, claims involving constitutional rights, like all other claims, must be asserted in a timely manner. See *State* v. *Patterson*, 230 Conn. 385, 392, 645 A.2d 535 (1994) (equal protection rights waived if not timely raised in some instances), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996); *Dragan* v. *Connecticut Medical Examining Board*, 223 Conn. 618, 629, 613 A.2d 739 (1992)

(constitutional and statutory rights can be waived if not asserted in timely fashion).

In *Reed* v. *United Transportation Union*, 488 U.S. 319, 334, 109 S. Ct. 621, 102 L. Ed. 2d 665 (1989), the United States Supreme Court observed that claims under 42 U.S.C. § 1983, which protects the exercise of first amendment rights, are governed by state general or residual personal injury statutes of limitation. Here, the newspapers cite no convincing state or federal authority to support their claim that an action alleging a first amendment violation cannot be time barred when it is not commenced within the time provided by law. Connecticut courts have stated that "[a] validly enacted statute carries with it a strong presumption of constitutionality, [and] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt." (Internal quotation marks omitted.) *Corcoran* v. *Taylor*, 65 Conn. App. 340, 348, 782 A.2d 728, cert. denied, 258 Conn. 925, 783 A.2d 1027 (2001). We conclude that the newspapers have not met their heavy burden.

The Courant nonetheless argues that each day the public is denied access to the protected documents constitutes a new violation of its constitutional and common-law rights. We take that claim to be a variation on the argument that § 52-212a is unconstitutional as applied to this case. Citing several United States Supreme Court cases, the Courant contends that it is never too late for those whose rights are being violated daily to seek relief from the action that constitutes the violation. None of the cited cases,[43] however, involves a similar statutory limitation or can be construed to support the argument that the four month limitation

---

[43] See *Nebraska Press Assn.* v. *Stuart*, 427 U.S. 539, 561, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976); *Elrod* v. *Burns*, 427 U.S. 347, 373–74, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Globe Newspaper Co.* v. *Pokaski*, 868 F.2d 497, 507 (1st Cir. 1989).

does not apply. Moreover, the record contains no evidence that the newspapers could not have asserted their claims at the proper time because they lacked actual notice that the cases had been withdrawn. Accordingly, the argument is without merit.

2

The defendants also claim that the court had no inherent authority to open a new file upon receipt of the Times' application. We agree.

The court relied primarily on General Statutes § 51-52 (b) and Practice Book § 7-7 as authority to open the file. Statutory construction raises an issue of law, and our review is, therefore, plenary. *Jones* v. *Riley*, 263 Conn. 93, 99, 818 A.2d 749 (2003).

The principles that govern the scope of our plenary review are well established. "It is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 493, 778 A.2d 33 (2001). "The rules of statutory construction apply with equal force to Practice Book rules." (Internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn. App. 1, 13 n.5, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003).

We begin by examining the texts of the two provisions. "We construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation. . . . [A] court must construe a

statute as it finds it, without reference to whether it thinks the statute would have been or could be improved by the inclusion of other provisions." (Citation omitted; internal quotation marks omitted.) *Grondin* v. *Curi*, 262 Conn. 637, 652, 817 A.2d 61 (2003).

General Statutes § 51-52 describes the general duties of clerks. Subsection (b) provides that "[e]ach clerk of court may store the inactive records of his court in any place of safekeeping designated by the Chief Court Administrator and may place the records in the direct custody of the records management officer or other designee of the Chief Court Administrator. The records management officer or designee shall be charged with the safekeeping of the records, and, when requested, may certify copies of the records."

Chapter seven of the Practice Book also describes the general duties of clerks, with particular emphasis on files and records. Section 7-7 pertains to custody of the files and provides that "[c]lerks will not permit files, records, transcripts, or exhibits to be taken from their offices, except for use in the courtroom or upon order of a judicial authority. No person shall take any file from the custody of the clerk or from the courtroom without the express authority of a judicial authority or a clerk of the court and unless a proper receipt is given to the clerk on a form prescribed by the office of the chief court administrator."

We conclude that the language of the statute and the rule of practice did not provide the court with authority to create a new file for considering the emergency motion and all future "related" matters in the withdrawn cases. The statutory provision is clearly directed to the duties of clerks, with specific emphasis on the physical storage and safekeeping of inactive records. Correspondingly, the rule of practice describes the conditions that must be met before files may be removed from

the office of the clerk or from the courtroom. Both provisions pertain to existing active or inactive files, and their language cannot reasonably be construed to grant the court authority to create a new file under the present circumstances.

We next look to the legislative history of the statutory provision and the policy it was designed to implement. The original language of § 51-52 (b) was adopted during the 1963 legislative session and was contained in a bill entitled "An Act Concerning the Storing of Inactive Court Records." See Public Acts 1963, No. 499; see also 10 H.R. Proc., Pt. 3, 1963 Sess., pp. 1092–93. The bill was limited in scope and was intended to amend existing statutory directives regarding the duties of clerks. During the House proceedings, it was noted that the bill merely gave "the Clerk of all of our courts the right to store the records of inactive cases, etc., in a place of safe-keeping that is designated by the judge." 10 H.R. Proc., supra, p. 1093, remarks of Representative Benjamin M. Schlossbach. There is nothing in the brief legislative history of the bill that would support a broader, more liberal interpretation of the statutory language.

Moreover, common-law principles have established that "[t]he clerks of the court are merely recording officers . . . . Their function is merely ministerial." (Internal quotation marks omitted.) *Plasil* v. *Tableman*, 223 Conn. 68, 77, 612 A.2d 763 (1992). "The word ministerial under our law refers to a duty which is to be performed by an official in a given state of facts, in a prescribed manner . . . without regard to or the exercise of his own judgment [or discretion] upon the propriety of the act being done." (Internal quotation marks omitted.) *Pluhowsky* v. *New Haven*, 151 Conn. 337, 347, 197 A.2d 645 (1964). A clerk is therefore "a mere arm of the court to perform a portion of the acts necessary to be done by the court, but which are not of a judicial nature." *Farber* v. *Conti*, 84 Conn. 458, 462, 80 A. 581

(1911). Pursuant to those principles, a statutory provision regarding the ministerial duty of clerks to store inactive files in a place of safekeeping cannot be construed as granting the court inherent authority and discretion to create a new file for the purpose of addressing the Times' application.

The court also relied on a 1943 opinion issued by the attorney general.[44] See Opinions, Conn. Atty. Gen. No. 43-141 (June 24, 1943). The opinion was in response to a question by the clerk of the Waterbury Superior Court regarding whether original naturalization records in the custody of the clerk could be removed from the clerk's office for use by the office of the attorney general in Washington.

In his opinion, the Connecticut attorney general quoted from the General Statutes and the rules of practice on the duties of clerks with respect to files. He then stated: "It is apparent from the foregoing that a clerk of a court is charged with the custody and preservation of the court's files and records, and that he must not permit their removal from his office unless the files and records are to be used in the courtroom during the actual trial of a case, or unless an order for their removal is entered by a judge of the particular court. . . . Since the contemplated removal of the records in the instant matter is not for the purpose of using them in the courtroom during the actual trial of a case, you, as the Clerk of the Court, cannot give up the custody thereof unless and until a proper order of a Judge of the Superior Court is entered for their removal . . . ." Id., 142. The attorney general later continued, "they are the records of these courts, the property of the State, and subject to the supervision and control of the Superior Court.

---

[44] The court cited the opinion in the May 8 memorandum, but not at the April hearing or in its June articulation. Nevertheless, we discuss it here because it speaks to the same issues as the relevant statutory provision and rule of practice.

"A court of record has general authority over its own records, and they are within its custody and control. The control which a court exercises over its own records has been held to be inherent and not subject to defeat by a ministerial act or omission of the clerk. . . . All in all, there does not seem to exist any right on your part, as Clerk, to deliver up the records in question . . . without a Superior Court judge's order therefor." (Citation omitted.) Id., 144.

The language of the opinion and the context in which it was spoken could not be more clear. The attorney general was not addressing the court's inherent authority to take discretionary action with respect to a complaint, application or petition. He was addressing the court's and the clerk's respective authority to permit removal of existing records from the physical confines of the clerk's office. The opinion thus fails to support the court's position that it had inherent authority to open a new file upon receipt of the Times' application, which the court had invited it to submit.

The newspapers assert that the court's inherent power to open the new file is based on fundamental notions of fairness and due process relating to the public's right of access to court files. We construe that position as another variation on the argument that the jurisdictional limitation of § 52-212a is unconstitutional when applied to first amendment claims. Turning the argument on its head, however, by changing its emphasis from the unconstitutionality of the statute to the public's right of access does not give it additional credence or weight. Furthermore, the cases cited by the newspapers in support of the claim do not address the jurisdictional limitation of § 52-212a, but stand for the proposition that nonparties may permissively and timely intervene for the purpose of challenging confidentiality orders,[45] an issue that is not in dispute.

___

[45] The cited cases include *Equal Employment Opportunity Commission* v. *National Children's Center, Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998);

The court justified its actions at the April hearing by speaking of its inherent authority and duty to address complaints, applications and petitions, but even if the court possessed inherent authority, or authority based on a theory of continuing jurisdiction, to take the actions that it did, it failed to exercise the claimed authority properly. For example, a summons and complaint must be served to commence a new proceeding. See General Statutes § 52-45a; see also Practice Book § 8-1.[46] A summons directs the marshal or other proper officer to notify the party named that an action has been commenced against him in the court from which process has issued, and that he is required to appear,[47] on a day named, to answer the complaint. Black's Law Dictionary (6th Ed. 1990). The proper filing of a summons and complaint serves as notice to the relevant parties, giving them an opportunity to appear and to be heard in opposition to the complaint. See General Statutes § 52-45a. Here, however, no formal summons and complaint were filed, and the record is devoid of evidence that the Times' motion and application were served properly in the manner the statute directs on all of the relevant parties in the underlying cases.

The Times states that it initially served notice of its motion on all of the attorneys who appeared in the

*Grove Fresh Distributors, Inc.* v. *Everfresh Juice Co.*, 24 F.3d 893, 896 (7th Cir. 1994); *Public Citizen* v. *Liggett Group, Inc.*, supra, 858 F.2d 783; and *Martindell* v. *International Telephone & Telegraph Corp.*, 594 F.2d 291, 294 (2d Cir. 1979).

[46] Practice Book § 8-1 (a) provides in relevant part: "Mesne process in civil actions shall be a writ of summons or attachment, describing the parties, the court to which it is returnable and the time and place of appearance, and shall be accompanied by the plaintiff's complaint. Such writ . . . shall be signed by a commissioner of the superior court or a judge or clerk of the court to which it is returnable. . . ."

[47] "The appearance is an *acknowledgment* that (a) one is representing oneself (pro se) or (b) an attorney is representing another, in a legal proceeding." (Emphasis added.) W. Horton & K. Knox, 1 Connecticut Practice Book Series: Practice Book Annotated (2003 Ed.) § 3-1, comments, p. 269.

three captioned cases, and believes that it later served most, if not all, of the attorneys and pro se parties who appeared in the twenty remaining cases. The Times nonetheless concedes that some of the attorneys it served might no longer represent those parties. In fact, that turned out to be the case with the intervening John Doe priests.

The newly created file contains a letter dated April 11, 2002, written by attorney Mark R. Kravitz, who represented the John Doe priests in the proceedings before the Superior Court in 1998 and in their subsequent successful appeal two years later. The letter was addressed to the trial court in the present matter, and advised the court that he, Kravitz, had first learned of the emergency motion on April 1, 2002, when he received a facsimile (fax) from counsel for the Times, and that he had learned of the scheduled hearing the previous day when he received a notice by fax that apparently was sent by the court. Kravitz explained that his representation of the nonparty priests had ended when the *Rosado* case was withdrawn. He further explained that he had informed the priests by overnight mail on April 1 and April 10, 2002, that the emergency motion had been filed, that the hearing had been scheduled and that he no longer could represent them in the new proceeding because of changed circumstances.

We conclude that the newly opened file is subject to numerous procedural irregularities and outright violations of pertinent rules and statutes. None of the defendants was summoned to the "new case" that the court had created despite the provisions of § 52-45a directing, in relevant part, that "[c]ivil actions shall be commenced by legal process consisting of a writ of summons or attachment, describing the parties, the court to which it is returnable, the return day [and] the date and place for the filing of an appearance . . . [and that] [t]he writ shall be accompanied by the plaintiff's

complaint. . . ." There also was no compliance with General Statutes § 52-46, which provides in relevant part that such process shall be "returnable to the Superior Court, at least twelve days, inclusive," before the day of the sitting of the court. The Times' informal notification of attorneys who represented parties in the prior actions, and the manner in which appearances were recorded by the clerk's office, are especially troubling.

The record contains a document issued by the clerk's office indicating that as of April 23, 2002, twelve appearances had been entered in the new file by or for the Times; the Courant; the Reverend Driscoll, as the executor of the estate of the late Bishop Curtis; and law firms representing nine sets of unnamed "interested parties." None of the law firms representing the "interested parties," however, had actually appeared. The clerk's office either made the entries on its own initiative, or at the court's direction, because they do not reflect accurately the status of appearances entered as of that date.[48] For

[48] The court file indicates the following: the Times filed an appearance on March 26, 2002, in the *See* case; Jonathan M. Albano requested permission on April 19, 2002, to represent the Times pro hac vice in the three captioned cases in the emergency motion; the Courant filed an appearance on April 22, 2002, in the *See* case; the John Doe priests numbers one and two filed an appearance on April 19, 2002, in the *Rosado* case; Raymond Pcolka filed an appearance on April 22, 2002, in the *Rosado* case; the Reverend Driscoll, as the executor of the estate of the late Bishop Curtis, filed an appearance on April 23, 2002, in the *See* case; the John Doe priests numbers four and five filed an appearance on April 23, 2002, in the *Rosado* case; the Globe and the Post filed an appearance on May 6, 2002, in the newly created file; and the Reverends Coleman and Carr filed an appearance on May 15, 2002, in the newly created file. The appearance forms filed by the John Doe priests one and two, the Courant, Pcolka and the Reverend Driscoll, and attorney Albano's request to appear pro hac vice, all show the respective docket numbers crossed out and replaced with the handwritten docket number of the newly created file, 170932. This may be explained in part by a "note to file" written by the deputy chief clerk of the Waterbury judicial district. The note stated that prior to the filing of the Times' application on April 19, 2002, the court had received certain related motions and documents that "were not docketed in the files bearing their case captions by the clerk because those actions were withdrawn on March 12, 2001, and cannot be

example, no entry was made for the appearance by Raymond Pcolka on April 22, 2002,[49] and no appearance forms were filed by seven of the nine law firms that allegedly appeared for the "interested parties."[50]

The manner in which appearances were, or were not, made by the John Doe priests in the newly created file raises additional troubling questions. As previously discussed, Kravitz notified the court that he could not represent them in the present action. Although another attorney filed appearances in the new proceeding for four of the seven priests, the record does not disclose whether the three remaining priests did not file formal appearances because they failed to receive the letters from Kravitz or because they simply did not want to participate.[51] The only certainty is that *none* of the John Doe intervenors to whom the court had granted legal "as of right" status to intervene in the *Rosado* case to prevent disclosure of materials in their statutorily protected personnel files was ever summoned to court in the manner our law requires to commence a new action in the newly created file.

restored to pending status." It therefore appears that a clerk of the court may have crossed out the docket numbers of the withdrawn cases and added the docket number of the new file.

[49] The appearance was filed by the law firm of Rubens and Lazinger.

[50] There are no appearance forms in the court file for the law firms of Halloran and Sage, Kleban and Samor, Henry Lyons III, Tremont and Sheldon, Wiggin and Dana, Gallagher and Calistro, and Danaher Tedford Lagnese and Neal, P.C., all of which were listed as having appeared for "interested parties." In fact, the file contains a letter to the clerk of the court dated April 16, 2002, from attorney William Gallagher of Gallagher and Calistro, stating that, although he previously had represented the plaintiffs in the appeal by the John Doe priests in the *Rosado* case, he did not intend to participate in the present matter.

[51] We note, however, that the appeal designated AC 23017 was filed on behalf of John Doe priests numbers one through five, thus suggesting that another John Doe priest also received the letters sent by Kravitz. This conclusion is supported by a verbal exchange between the court and the priests' new attorney, John F. Conway, at the April 24 hearing, in which Conway stated that he was representing five of the seven priests.

The significance of this omission cannot be overestimated. The John Doe priests had not been sued by any of the plaintiffs in the twenty-three cases. None of the plaintiffs had pleaded in their complaints that the John Doe priests had done anything improper. Their personnel records were confidential pursuant to General Statutes § 31-128f. *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, supra, 60 Conn. App. 135. Two of the seven priests never entered appearances in the new file. Yet, the court proceeded in the new file that it had created to take certain actions affecting the rights of all of the John Doe priests, despite the lack of proper notice to them and a ruling of this court in the year 2000 that, because "there is clearly no party charged by law representing their interests"; id., 149; they were entitled to intervene as of right in the *Rosado* case to shield their statutorily protected personnel records from public examination. Id., 153.

That the Times filed the application at the court's suggestion does not excuse those procedural improprieties, but makes them all the more surprising. Accordingly, we conclude that, even if we were to assume that the court had authority or continuing jurisdiction to create a new file, the process by which it created the file must be deemed legally insufficient because the basic procedural requirements established by laws that our General Assembly has enacted for the commencement of a new action were, for all practical purposes, ignored.

Our words in *Wren* v. *MacPherson Interiors, Inc.*, 69 Conn. App. 349, 363–64, 794 A.2d 1043 (2002), where the defendants filed an untimely motion to open the case, are also relevant in the present context. We stated in *Wren* that "[t]he facts . . . demonstrate only that the defendants had numerous opportunities to assert and defend their position . . . and, on numerous occasions, failed to do so. The defendants now attempt . . .

to make an end run around the four month limitation contained in § 52-212a . . . by casting blame on [others] . . . while at the same time characterizing themselves as the victims of injustice." Id.

The record indicates that the newspapers were well aware that complaints alleging sexual abuse of minors by clergymen had been filed against the Diocese in the early 1990s.[52] Published articles confirm that national, regional and local news media assiduously followed developments in the cases until the time they were withdrawn. For example, on January 7, 1993, the Associated Press reported that a lawsuit had been filed against the Diocese and a Greenwich priest accused of sexually assaulting children while serving as pastor at a Stratford Catholic church. On January 9, 1993, the Courant reported that another victim of the same priest had filed a similar lawsuit against the Diocese. On November 14, 1994, the Bergen Record, a New Jersey newspaper, reported that a motion had been filed to seal documents in the *Rosado* case. On March 9, 2001, the Times reported that twenty-six parties who had accused priests in the Diocese of sexual abuse had agreed to drop their lawsuits in return for cash settlements; and on March 14, 2001, a story by the Times discussed the settlements and the lingering emotional damage suffered by one of the victims.

We reject the newspapers' claim that because they never had an opportunity to adjudicate the orders' enforceability, precluding them from doing so now would consign them to a perpetual deprivation of their

[52] Practice Book § 61-10 provides in relevant part that "the term 'record' . . . includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety." Volume two of the consolidated appendices of authorities attached to the Diocese's objection to the Times' emergency motion contains copies of twenty-one published articles about the withdrawn cases.

rights.[53] Such a claim ignores the newspapers' failure to intervene in a timely manner while the underlying cases were pending or within four months following the date of their withdrawal.[54] At best, the newspapers divert attention from their own belated actions, despite extensive knowledge of trial court proceedings, by attempting to cast blame on others while portraying themselves as victims who are merely seeking validation of their constitutional rights. See id.

We have come full circle to affirm, once again, our long held respect for the strict procedural safeguards that are "[t]he cornerstone of this society." *United States* v. *Martinez-Fuerte*, supra, 428 U.S. 578 (Brennan, J., dissenting). The United States Supreme Court has stated repeatedly that a trial court's inherent powers do not give it discretion to circumvent the applicable rules of procedure. See *Carlisle* v. *United States*, 517 U.S. 416, 426, 116 S. Ct. 1460, 134 L. Ed. 2d 613 (1996); *United States* v. *Smith*, 331 U.S. 469, 473–74, 67 S. Ct. 1330, 91 L. Ed. 1610 (1947). Our own precedent is consistent with that principle. See *DAP Financial Management Co.* v. *Mor-Fam Electric, Inc.*, 59 Conn. App. 92, 96, 755 A.2d 925 (2000) (court's inherent authority to open, correct and modify judgments is restricted by statute and rules of practice); *Connecticut National Bank* v. *Oxenhandler*, 30 Conn. App. 541, 546, 621 A.2d 300 (same), cert. denied, 225 Conn. 924, 625 A.2d 822

---

[53] The claim refers to the fact that Practice Book § 11-20 (b), which protects the public's right of access to judicial proceedings and documents when considering requests for sealing and protective orders, did not take effect until October 1, 1995, ten months after the *Rosado* order was issued, and that Practice Book § 11-20 (e), which provides for an expedited right to appeal such orders, did not take effect until January 1, 2000. The claim thus raises the issue of whether the trial court properly notified and granted to those who may have opposed the orders the opportunity to be heard before the orders were issued.

[54] The newspapers have not presented any record of evidence establishing that they lacked knowledge of when the lawsuits were withdrawn.

(1993); *Batory* v. *Bajor*, 22 Conn. App. 4, 8, 575 A.2d 1042 (same), cert. denied, 215 Conn. 812, 576 A.2d 541 (1990).

Had the newspapers acted earlier, they could have received a proper hearing on the merits of their claims and might have won some, or even all, of the relief they now seek. Absent timely filings, however, the court could not create out of whole cloth a legitimate method to consider the newspapers' motions without due regard for the well established legal principles that have always served as our guide. Just as "a little cloud may bring a flood's downpour"; (internal quotation marks omitted) *La Buy* v. *Howes Leather Co.*, 352 U.S. 249, 258, 77 S. Ct. 309, 1 L. Ed. 2d 290 (1957); our condoning of the trial court's actions in the present case would set a dangerous precedent for reinstating proceedings on interlocutory orders in countless other closed cases involving divorces, trade secret litigation and the entire panoply of civil litigation where files remain extant. We decline to abrogate laws enacted by the General Assembly which would open that potential "Pandora's box," and accordingly conclude that the court had no authority or jurisdiction to restore the underlying cases to the docket at the time and in the manner that it did.

### III

In light of our conclusions in part II of this opinion, we do not reach the second four appeals from the May 8 memorandum of decision.

The decision of the trial court granting the Times' application and the court's subsequent orders concerning the disclosure of the sealed and protected materials are reversed.

In this opinion the other judges concurred.